Filed 8/4/21  P. v. Reyes CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ANDRES QUINONEZ REYES,<br><br>    Defendant and Appellant. | G059251<br><br>(Super. Ct. No. 04CF2780)<br><br>O P I N I O N |

Appeal from a postjudgment order of the Superior Court of Orange County, Richard M. King, Judge.  Affirmed.

Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Jennifer B. Truong, Deputy Attorneys General, for Plaintiff and Respondent.

*        *        *

Defendant Andres Quinonez Reyes was convicted of the second degree murder of Pedro Javier Rosario. Defendant was not the actual shooter. Following the passage of Senate Bill No. 1437 (Stats. 2018, ch. 1015, §§ 2-4) (Senate Bill No. 1437) in 2018,[1] defendant filed a petition for resentencing pursuant to Penal Code section 1170.95. (All further statutory references are to the Penal Code.)

The trial court appointed counsel for defendant and conducted an evidentiary hearing. Following that hearing, the court concluded, beyond a reasonable doubt, that a jury would have found defendant guilty of murder even after the passage of Senate Bill No. 1437. The trial court therefore denied defendant's section 1170.95 petition.

We conclude substantial evidence supports the trial court's determination the prosecution proved beyond a reasonable doubt that defendant would have been found guilty of murder after the passage of Senate Bill No. 1437. Therefore, we affirm the trial court's order denying defendant's section 1170.95 petition.

STATEMENT OF FACTS

During the afternoon of August 10, 2004, defendant, a member of the F-Troop criminal street gang, was at a park in Santa Ana with other members of that gang. One of the gang members, Francisco Lopez, displayed a revolver to the group.

At about 6:30 p.m. on August 10, near the intersection of Sullivan Street and Willits Street in Santa Ana, a group of seven teenage males on bicycles accosted Rosario, who was driving a car. Lopez shot Rosario once in the head. The teenagers split up into two groups and rode away on their bicycles.

---

[1] "The intent of [Senate Bill No. 1437] was to limit application of the felony-murder rule and murder based on the natural and probable consequences doctrine by modifying the mens rea element of those crimes. The legislation also created a procedure by which a defendant previously convicted of murder under either of those theories could file a petition for resentencing." (*People v. Solis* (2020) 46 Cal.App.5th 762, 768-769.)

Rosario died at the scene from a single gunshot wound to the head. He was affiliated with the West Myrtle street gang.

A Costa Mesa police officer, who happened to be conducting surveillance nearby in an unmarked police car, witnessed the shooting. The officer saw an Hispanic male standing in the middle of the street, straddling a bicycle, place a handgun into the waistband of his pants. Two other individuals on bicycles were behind the person with the handgun; the three rode off together.

At about 7:00 p.m. on the same evening, while walking near English Street and 10th Street in Santa Ana, Jaime Nieves encountered defendant and three other teenagers on bicycles. Defendant asked Nieves what kind of "barrio" he belonged to, which Nieves understood to mean which gang he belonged to. Nieves denied belonging to a gang, and said he did not want any problems. Defendant said he was from "the Troop" and asked Nieves if he wanted to fight. Nieves said he did not want to fight. Nieves noticed defendant had his hands on his waist and looked like he was going to pull something out of his waistband.

Nieves ran toward his girlfriend's house, and defendant followed him. When defendant caught up with Nieves, defendant pushed him and started to hit him. The other teenagers with defendant also started to hit Nieves; several individuals also got out of a passing car and started hitting Nieves. Nieves felt a gun behind his neck, and saw that defendant was holding it. Nieves hit defendant, causing the gun to fall between Nieves's feet. Nieves ultimately threw the gun into a nearby yard. When the police arrived, defendant and the other individuals who had been attacking Nieves left.

Defendant was arrested soon after the shooting. While being transported to juvenile hall, defendant asked the arresting officers what the charges against him were. When one of the officers said, "[I]t looks like it's a probation violation," defendant replied, "No, I'm going to be charged with murder, because me and five of my homies

3

were down on Sullivan at a shooting. And I didn't shoot, but because I was there with my homies, I'm going to get charged with murder too."

The prosecution offered the testimony of Officer David Rondou as a gang expert. Rondou testified that the F-Troop gang was an Hispanic gang with a couple hundred members that regularly engaged in narcotics sales and assaults with firearms, including murder. West Myrtle was one of F-Troop's rival gangs. The area in which the murder occurred was on the edge of the territory claimed by West Myrtle.

Guns are "huge" in the gang culture because they enable the gang members to protect themselves and to commit crimes. Rondou testified about gang guns, which are single guns passed between members of the gang to use in committing crimes. Rondou also testified that those who support the person actually committing the crime are referred to as "backup" and are treated with equal respect.

In January 2004, defendant had been arrested with several other individuals, some of whom were admitted gang members. At that time, defendant told the police he hung around with F-Troop members and was going to claim F-Troop but he got busted. The police served defendant with a S.T.E.P. notice (a S.T.E.P. notice is a notice of determination of gang membership). Defendant was again arrested in March 2004 in El Salvador Park; he admitted to the police that he was tagging F-Troop graffiti on park benches.

Rondou opined that defendant was an active participant in the F-Troop criminal street gang on August 10, 2004 and that the murder was committed for the benefit of and in association with the F-Troop gang, and was committed to promote, further, or assist criminal conduct on behalf of the gang. Rondou's opinions were based on the number of gang members involved, the possibility that the victim was a rival gang member, that the shooting took place in claimed rival gang territory, that the gang members' reputations would be enhanced by the shooting, and that defendant was in possession of the gun after the murder, indicating he had been entrusted with it.

4

At the resentencing hearing, defendant offered the testimony of a child development expert, Dr. Elizabeth Cauffman. Dr. Cauffman testified that a 15-year-old's brain is in the middle adolescence of that child's brain development. Children of this age are less mature and more irresponsible than teenagers even one or two years older, and are less future-oriented, more impulsive, and less able to control their impulses than an adult. The risk-taking behaviors in which adolescents engage do not decrease until they are 25 years old, when the portion of the brain that controls communication and messaging within the brain fully develops. Dr. Cauffman also testified that the use of alcohol, marijuana and other drugs by adolescents creates chemical changes in the brain which impair emotional development and make adolescents more impulsive and immature.

On August 10, 2004, defendant was 15 years old. The others with him on that date were all between 16 and 21 years of age.

Defendant also testified on his own behalf at the resentencing hearing. He admitted being at El Salvador Park on August 10, 2004, and being shown the gun that was later used in the shooting of Rosario. Defendant also admitted being a member of the F-Troop gang, and admitted that the West Myrtle gang was a rival of F-Troop.

After visiting two other F-Troop members on August 10, defendant and a group of other F-Troop members or allies were returning to El Salvador Park when the murder occurred. Defendant knew the area was on the fringe of West Myrtle's claimed territory, and knew that Lopez had the gun in his possession at that time. Defendant saw Lopez talking to Rosario, but could not hear what they were saying; defendant denied yelling at Rosario before the shooting and denied knowing why Lopez stopped Rosario's car. Defendant was about 30 feet away when Lopez shot Rosario. Defendant admitted that he had the gun in his own possession shortly thereafter, but denied that he took it from Lopez.

5

Defendant also admitted confronting Nieves with the gun on August 10, telling Nieves he was an F-Troop member, and asking Nieves where he was from. Defendant denied placing the gun at the back of Nieves's head and claimed the gun fell out of his waistband when he and Nieves were fighting.

PROCEDURAL HISTORY

Defendant was charged with first degree murder (§ 187, subd. (a)) and street terrorism (§ 186.22, subd. (a)). In connection with the first count, it was alleged that defendant committed the murder for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further, and assist the criminal conduct of the gang's members (§ 186.22, subd. (b)(1)), and that defendant was a gang member who vicariously discharged a firearm causing death (§ 12022.53, subds. (d), (e)(1)). During jury deliberations, the People made a motion to dismiss the first degree murder allegation, which the trial court granted.

The jury found defendant guilty of second degree murder and street terrorism, and found all sentencing allegations to be true. The trial court sentenced defendant to 40 years to life with the possibility of parole: 15 years to life for count 1, 25 years to life for the firearm enhancement, 10 years to life for the gang enhancement (which was stayed pursuant to section 654), and a concurrent two-year term for count 2.

Defendant filed a notice of appeal; this court affirmed his convictions and sentence. (*People v. Reyes* (Aug. 21, 2007, G037395) [nonpub. opn.].)

In January 2019, defendant filed a petition to vacate his murder conviction and for resentencing pursuant to section 1170.95. After the People filed a written response defendant, through appointed counsel, filed a written reply, and both parties filed supplemental briefs. The trial court found that defendant had made a prima facie showing of eligibility under section 1170.95, and issued an order to show cause.

The trial court then conducted an evidentiary hearing on defendant's resentencing petition. The People offered into evidence the transcript of defendant's trial.

6

Defendant offered the testimony of a developmental psychologist on adolescent brain development. Defendant also testified on his own behalf. At defendant's request, the trial court took judicial notice that at the time of the murder, defendant's codefendants were all between the ages of 16 and 21.

The trial court denied defendant's petition. Defendant timely filed a notice of appeal from the order denying his resentencing petition.

DISCUSSION

I.

*SENATE BILL NO. 1437*

Before the enactment of Senate Bill No. 1437, "the felony-murder rule and the natural and probable consequences doctrine . . . existed as exceptions to the requirement of malice as an element of murder." (*People v. Solis, supra*, 46 Cal.App.5th at p. 774.) "The stated purpose of Senate Bill No. 1437 was to reform the law relating to the felony-murder rule and the natural and probable consequences doctrine: 'It is necessary to amend the felony-murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.'" (*Id.* at pp. 774-775.)

As part of the legislation, section 188 was amended to add that "[m]alice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).) Subdivision (e) was added to section 189 as follows: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶]

7

(3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e).) Finally, the legislation added a mechanism by which a defendant convicted under the felony-murder rule or the natural and probable consequences doctrine could seek to have his or her conviction vacated. (§ 1170.95.)

## II.

### BURDEN OF PROOF AND STANDARD OF REVIEW

At a hearing on a section 1170.95 petition, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing. If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges. The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens." (§ 1170.95, subd. (d)(3).) Therefore, at the resentencing hearing, "the prosecutor's burden is to prove that the state *would* be able to prove the petitioner's guilt of first or second degree murder under current law." (*People v. Lopez* (2020) 56 Cal.App.5th 936, 948-949, review granted Feb. 10, 2021, S265974; see *People v. Rodriguez* (2020) 58 Cal.App.5th 227, 230-231, review granted Mar. 10, 2021, S266652; but see *People v. Duke* (2020) 55 Cal.App.5th 113, 123, review granted Jan. 13, 2021, S265309 [prosecution bears burden of proving beyond a reasonable doubt "that the defendant *could* still have been convicted of murder under the new law"].)

In determining whether the People have proven a defendant's ineligibility for relief under section 1170.95, "it is the court's responsibility to act as independent fact finder and determine whether the evidence establishes a petitioner would be guilty of murder under amended sections 188 and 189 and is thus ineligible for resentencing under

8

section 1170.95, subdivision (d)(3)." (*People v. Rodriguez, supra*, 58 Cal.App.5th at pp. 243-244; see *People v. Lopez, supra,* at p. 949.)[2]

On appeal, we review the trial court's independent findings for substantial evidence. (*People v. Williams* (2020) 57 Cal.App.5th 652, 663; *People v. Lopez, supra*, 56 Cal.App.5th at pp. 953-954.)

III.

*ANALYSIS*

The parties agree that at the original trial of this matter, the prosecution relied on the natural and probable consequences doctrine, which can no longer be the basis for a murder conviction. (See *People v. Larios* (2019) 42 Cal.App.5th 956, 964, review granted Feb. 26, 2020, S259983.) The jury was also instructed regarding aiding and abetting, and express and implied malice.

At the section 1170.95 hearing, the trial court made the following findings:

"The Court at this time has concluded that the People . . . have proved beyond reasonable doubt that, based on the record before the Court, there's a valid theory of murder, and that is murder of the second degree.

"In reaching that conclusion, the Court is guided by the principles that are in 520 of CalCrim, specifically implied malice. Let me go through the elements.

---

[2] The following issue is currently before the California Supreme Court in *People v. Duke* (Jan. 13, 2021, S265309): "Can the People meet their burden of establishing a petitioner's ineligibility for resentencing under Penal Code section 1170.95, subdivision (d)(3) by presenting substantial evidence of the petitioner's liability for murder under Penal Code sections 188 and 189 as amended by Senate Bill No. 1437 (Stats. 2018, ch. 1015), or must the People prove every element of liability for murder under the amended statutes beyond a reasonable doubt?"

We need not address the conflict in authority because the trial court applied the stricter beyond a reasonable doubt standard and found defendant ineligible for relief under that heightened standard.

9

"One, the defendant intentionally committed, an act. The Court has concluded that the act in this case is the defendant, along with several other gang members, one of which is armed, traveled to rival gang territory.

"Two, the . . . natural and probable consequences of the act were dangerous to human life. The Court has considered the expert's testimony in that and has concluded that that element is present.

"The third element, at the time he acted, he knew that the act was dangerous to human life. With regards to that, the defendant saw the gun by the co-gang member before they left. He actually went with the [person] who turned out to be the actual shooter, with the others, to rival territory.

"The Court also has considered . . . the statement of the defendant to, I believe, Officer Ashby, where he indicated I did not shoot, but because I was there, I'm charged with murder. The Court does find that admission by the defendant does show Element Number 3, that he knew that what he was doing was dangerous to human life.

"The final element, that he deliberately acted with conscious disregard for human life, the Court has found that present as well, and I specifically found persuasive the conduct of the defendant 40 minutes later where he is involved in an altercation using the same gun."

Defendant contends that substantial evidence does not support these findings. We disagree. Defendant's appellate briefs focus on whether defendant's action in walking or riding his bicycle to the place where Rosario was shot was a culpable act or dangerous to human life. However, like the trial court, we believe implied malice cannot be determined based only on that one piece of the puzzle. Rather, it was incumbent upon the trial court to consider the totality of defendant's actions on the day in question.

The evidence showed that defendant and Lopez were both members of a criminal street gang. They gathered with other gang members in a park, at which time Lopez displayed the gun. The gang members, including defendant and Lopez, rode their

10

bicycles about a mile and a half to a location on the border between the territory claimed by defendant's gang and the territory claimed by Rosario's gang. They confronted a man in a car, who was affiliated with a rival gang, and Lopez shot him in the head. Defendant described Lopez and the other gang members as his "homies."

A mere half hour later, defendant was in possession of the same gun that Lopez had used to kill Rosario, and was assaulting another person with it. However, defendant dropped the gun, possibly preventing a second murder that day.

When we view the evidence in the light most favorable to the postjudgment order, and draw from that evidence all reasonable inferences, we conclude that substantial evidence supports the trial court's findings that implied malice had been proven, and that defendant was therefore not eligible for resentencing under section 1170.95.

DISPOSITION

The postjudgment order denying defendant's section 1170.95 petition is affirmed.


FYBEL, J.

WE CONCUR:


O'LEARY, P. J.


THOMPSON, J.

11